493 So.2d 294 (1986)
Robert Hall DRANE
v.
STATE of Mississippi.
No. 55964.
Supreme Court of Mississippi.
March 5, 1986.
As Modified on Denial of Rehearing September 17, 1986.
*295 Jack Nixon, Natchez, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Pat Flynn, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and SULLIVAN and ANDERSON, JJ.
ANDERSON, Justice, for the Court:
Robert Hall Drane was convicted in the County Court of Adams County for possession of a controlled substance with intent to distribute and was sentenced to five years' imprisonment. We reverse his conviction on that charge, but because of the evidence at trial would have supported a conviction for the lesser included offense of simple possession, we remand for resentencing.
On January 6, 1982, Robert Drane and his companion, Mary Boudreaux, were riding in a pickup truck along a gravel road in rural Adams County. This road traverses a section of the Homochitto National Forest containing the Sandy Creek Wildlife Management Area. Two wildlife conservation officers, James Cummins and David Southerland, had set up a roadblock on this thoroughfare to conduct a routine game check. When the officers saw Drane's truck approaching, they signalled for it to stop. They were asking Drane for his hunting license or other identification when one of them believed he detected the odor of marijuana. The truck was searched, and the wardens discovered a plastic bag filled with a substance the wardens identified as marijuana. They then informed Drane and his companion that they were under arrest. A scuffle ensued, but the two suspects were finally subdued.
After other law enforcement officials arrived on the scene, the wardens learned that several members of the Drane family lived at nearby Deerfield Plantation, and that his companion Mary Boudreaux had a history of drug abuse. Believing that Drane might have secreted additional drugs at the plantation, the wardens obtained a warrant for the search of the "White House", the principal residence there. A search of this house uncovered additional marijuana, as well as a quantity of brownies into which marijuana had been baked.
Drane and Boudreaux were indicted for possession of a controlled substance with intent to deliver. Their trials were severed, and Drane's case came before the County Court of Adams County. Defense counsel moved that the evidence obtained from the truck and the house be suppressed as the fruit of an unreasonable search and seizure. After a hearing, the court denied this motion. Trial was held, and a jury found Drane guilty as charged. The judge then sentenced him to five years' imprisonment, whereupon he perfected this appeal.
Of the many assignments of error, only a few have sufficient merit to warrant detailed discussion here.

*296 LAW

I. DID THE GAME INSPECTION VIOLATE THE FOURTH AMENDMENT?
The initial stop of Robert Drane's vehicle occurred under the authority of a regulation governing the supervision of wildlife management areas. This regulation was promulgated by the Commission on Wildlife Conservation pursuant to Mississippi Code Annotated, Section 49-1-29 (Supp. 1985), which authorizes the commission to "make such rules and regulations ... as it may deem necessary to carry out the provisions and purposes of this chapter." The regulation itself states: "Any vehicle may be searched for illegal game or firearms while within, entering or leaving a management area."
Drane contends that the stop and search of his vehicle, and by implication any statute or regulation authorizing it, were unconstitutional in that they violated the Fourth Amendment prohibitions against "unreasonable searches and seizures." Fourth Amendment considerations do, indeed, apply in these situations, since the stop of a vehicle is a "seizure" for Fourth Amendment purposes. United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607, 614 (1975).
Whether the seizure of a vehicle in an inspection stop is reasonable under the Fourth Amendment is determined by balancing its intrusion on the individual's interest in privacy against its promotion of legitimate government interests. Delaware v. Prouse, 440 U.S. 648, 653-54, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660, 667 (1979). In assessing the weight of the intrusion the court may consider such factors as the physical inconvenience and anxiety caused in the motorist. Prouse, 440 U.S. at 657, 99 S.Ct. at 1398, 59 L.Ed.2d at 670. One practical result of this analysis is that stops at fixed, identifiable road blocks have been held less intrusive for Fourth Amendment purposes than stops by roving police units. Thus, a border patrol road block at a fixed point was deemed permissible in part because any motorist passing it would normally expect to be stopped. U.S. v. Martinez-Fuerte, 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116, 1128-29 (1976). On the other hand a roving border patrol unit could stop a particular car, only if facts could be articulated to support suspicion of a violation. U.S. v. Brignoni-Ponce, 422 U.S. 873, 882-83, 95 S.Ct. 2574, 2580-81, 45 L.Ed.2d 607, 617 (1975). In Prouse, the court held that random stops of motorists to check drivers' licenses, whether by roving units or a fixed location, were constitutionally impermissible. Prouse, 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673. The current federal doctrine, then, seems to be that stops without probable cause are permissible, so long as they are not made at random and are not subject to the uncontrolled discretion of the officers.
Drane argues that the spot check in the present case does not pass constitutional muster. First, he contends that the stop involved what Prouse called an "unsettling show of authority." 440 U.S. at 667, 99 S.Ct. at 1398, 59 L.Ed.2d at 670. Second, he contends that in the absence of any departmental guidelines for the roadblocks, they partake of "standardless and unconstrained discretion" which the Supreme Court has regarded as a major evil in searches and seizures by police. Prouse, 440 U.S. at 661, 99 S.Ct. at 1400, 59 L.Ed.2d at 672.
The implications of the Fourth Amendment for game checks have figured in two recent state cases. In State v. Halverson, 277 N.W.2d 723 (S.D. 1979), the South Dakota Court rejected the Fourth Amendment challenge without any real discussion. But in State v. Tourtillott, 289 Or. 845, 618 P.2d 423 (1980), cert. denied 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 352 (1981), these issues were treated at length. Tourtillott involved a roadblock similar to that in the present case; all passing motorists were stopped to check for hunting licenses. When the defendant was stopped, it was discovered that she had a suspended drivers' license. She raised constitutional *297 questions substantially the same as Drane's in the present case.
The Oregon court rejected the constitutional challenge. After noting the obvious fact that the state had a legitimate interest in the conservation of game, the court performed the balancing test prescribed by the border patrol cases and Prouse. It concluded that "since all the vehicles were stopped or slowed at the checkpoint, the degree of psychological intrusion occasioned by the stop here is clearly more analogous to that found permissible in Martinez-Fuerte than to those in Brignoni-Ponce and Prouse." Tourtillott, 289 Or. at 858, 618 P.2d at 430. Further, the stop was not invalidated by the element of discretion involved. The court reasoned that:
[t]here was no exercise of discretion in the sense that the policeman would pull over any vehicle upon a "hunch." The fact that the roadblock was set during hunting season, in an area frequented by hunters, and subjected all vehicles to being stopped or slowed circumscribes the possibility of an abuse of discretion on the officers' part.
(289 Or. at 859, 618 P.2d at 430.)
The approach of Tourillott seems sounder than that urged by the appellant. The latter, if adopted, would effectively disable the state from conducting spot checks on game preserves. In Halverson, supra, the South Dakota court observed that "the only effective means of implementing [the state's game policy] is by use of roadblocks or check point stops in game areas. Stops on probable cause would not satisfy the purpose of the law, since the number of hunters is large and game officers few." 277 N.W.2d at 724. Without such checks, there is no reason to suppose that Mississippi would have any more success in enforcing its game laws than South Dakota would. We hold that such stops are permissible under the Fourth Amendment.

II. WAS THE REGULATION, AND THEREFORE, THE STOP, INVALID UNDER STATE LAW?
The fact that we have pronounced the regulation free of infirmity vis-a-vis the federal Constitution does not end our inquiry. A procedure may be perfectly in accord with the United States Constitution and yet run afoul of state constitutional or statutory requirements. Pinkton v. State, 481 So.2d 306, 309 (Miss. 1985); Penick v. State, 440 So.2d 547, 551 (Miss. 1983).
Drane argues that the Commission, being a mere administrative agency, has no authority to prescribe search and seizure regulations, and that by doing so it has usurped the prerogative of the legislature. Our leading case on such problems is Strong v. Bostick, 420 So.2d 1356 (Miss. 1982). This was a case involving a regulation banning the use of dogs as an aid for hunting deer in certain areas of the state. This Court held that:
The commission has the authority, and under certain situations the duty to promulgate rules and regulations ... where they do not conflict with an existing statute. (Emphasis added) (420 So.2d at 1362)
The state's brief asserts that the appellant "does not contend the regulation impermissibly conflicts with an existing statute." This is not correct. Appellant's brief refers to MCA § 49-1-43 (Supp. 1985). This section defines the duties and powers of state director of conservation and state conservation officers. The statute says in part, "the state director of conservation and each of his conservation officers shall have power and it shall be the duty ... of such conservation officer ... to make search where such conservation officer ... has cause to belief and does belief that animals, birds or fish ... are possessed in violation of law or regulation; and in such case to examine without warrant the contends of any boat, car, automobile or other vehicle... ." (Emphasis added)
Strong made it clear that the rule-making authority of the commission must be exercised subject to any statute. The pertinent statute imposes a requirement of probable cause as a pre-requisite to a warrantless search of a vehicle. Insofar as the regulation permits the search of vehicles *298 by an officer who has no cause to believe that a violation has been committed, it obviously conflicts with the statute. However, this does not decide the issue in the appellant's favor. The statute deals with searches, not with seizures. The stop of a vehicle legally constitutes a "seizure". By its terms, MCA § 49-1-43 (Supp. 1985) applies only to searches; the question is whether the legislature intended that it apply to seizures as well. There is good reason to believe that it did not.
Where possible, this Court will interpret statutes so as to realize their purposes rather than defeat them. Brady v. John Hancock Mut. Life Ins. Co., 342 So.2d 295, 303 (Miss. 1977). Nor will this Court impute an unjust or absurd purpose to the legislature when any other reasonable construction can save it from such an imputation. Baker v. State, 327 So.2d 288, 291 (Miss. 1976); Aikerson v. State, 274 So.2d 124, 127 (Miss. 1973). When two statutes on the same subject matter apparently conflict the court has the duty to harmonize them if possible, so as to effect the underlying policy. Western Line Consol. School Dist. v. Greenville Mun. Sep. School Dist., 433 So.2d 954, 958 (Miss. 1983); Surles v. State, ex rel., McNeel, 357 So.2d 319, 320-21 (Miss. 1978). § 49-1-43 must be harmonized with § 49-1-29, the section which sets for the powers and duties of the commission on wildlife conservation. That section states in pertinent part that the commission "is hereby authorized to make such rules and regulations ... as it may deem necessary to carry out the purposes and provisions of this chapter." It is difficult to see how those purposes can be effected if game wardens were not empowered to make routine stops of vehicles in wildlife management areas. Therefore, we are of the opinion that the legislature intended the probable cause requirement to apply to searches alone.
To sum up: the game wardens' stop of Drane in the present case was permissible despite the technical flaw in the department's regulation. The initial stop was authorized under the necessary and proper clause of § 49-1-29, and the ensuing search was permissible under § 49-1-43 because probable cause existed after the warden detected the odor of marijuana.

III. WAS THE SEARCH OF THE HOUSE VALID?
Drane advances two arguments here. The first need not detain us long. It asserts that the search of the house would never have come about unless marijuana had been found in the truck, and that since the search of the truck was improper, the evidence found later at the house was inadmissible as the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963). However, since we are holding that the search of the truck was valid, a fortiori we must hold that it did not envenom the evidence seized at the house.
In the alternative, Drane argues that the warrant for the search of the house was not based on reliable information and therefore lacked probable cause. Specifically, he argues that in issuing the warrant the magistrate relied not only on the first-hand knowledge of the affiants, but on certain information, provided by other sources, which pertained to the occupancy of Deerfield Plantation and to Mary Boudreaux' history as a drug user. Appellant argues that this information was in the nature of mere suspicion, and was thus insufficient to support a warrant.
The briefs discuss this issue in terms of the familiar "two-prong test" of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). This test is no longer the law. The U.S. Supreme Court recently adopted a new approach emphasizing the "totality of the circumstances". The court summarized its new doctrine as follows:
The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances in the affidavit before him, including the "veracity" and "basis of *299 knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular case. (Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983)).
Mississippi quickly adopted the Gates doctrine for state law purposes, Lee v. State, 435 So.2d 674, 676 (Miss. 1983), and has adhered to it since, e.g. Breckenridge v. State, 472 So.2d 373, 376 (Miss. 1985). Of particular interest is Hester v. State, 463 So.2d 1087 (Miss. 1985). In that case, the data contained in the affidavit was not, in itself, sufficient to supply probable cause, but the warrant was upheld because the magistrate also relied on information supplied to him orally.
There is little doubt that the warrant in the present case was supported by probable cause. The issuing magistrate knew from the affidavits that marijuana had been found in the truck. He also knew, from the testimony of other law enforcement officials, that the Drane family owned Deerfield Plantation, that Robert Drane was en route from the plantation to Natchez when his truck was seized, and that his companion was a known drug abuser. To use the language of Gates, he was certainly justified in concluding that there was a "fair probability" that more drugs could be found at the plantation. The issuance of the warrant was therefore proper.

IV. WAS THE EVIDENCE SUFFICIENT TO SUPPORT A CONVICTION ON THE CHARGE OF MORE THAN ONE KILOGRAM OF MARIJUANA?
Drane's indictment gives as its own statutory authority MCA § 41-29-139(2)(d). Correctly, it should have cited § 41-29-139(c)(2)(D). The statute reads, in pertinent part:
It is unlawful for any person knowingly or intentionally to possess any controlled substance. .. . Any person who violates this subsection with respect to ... [o]ne (1) kilogram or more of marihuana upon conviction may be imprisoned in the state penitentiary for not more than twenty (20) years... .
The evidence showed that the police seized 912.3 grams of pure marijuana, together with 119.6 grams of marijuana-laden brownies. Drane contends that the state satisfied the statutory requirement of a kilogram only by aggregating the weight of the pure marijuana with the total weight of the brownies, and that such aggregation was improper.
The status, with reference to the Controlled Substance Statute, of a mixture containing marijuana is an issue of first impression in Mississippi.
Among the states, there are two principal approaches to the problem. Some states have statutes specifically criminalizing the possession of marijuana or any mixture containing it. In these states, courts have generally permitted the aggregation of bulk weights with pure marijuana to satisfy the statutory requirement. E.g. Belcher v. State, 161 Ga. App. 442, 288 S.E.2d 299 (1982); Grogg v. State, 417 N.E.2d 1175 (Ind. 1981); People v. Kidd, 121 Mich. App. 92, 328 N.W.2d 394 (1982); State v. Tyndall, 55 N.C. App. 57, 284 S.E.2d 575 (1981). Other states have statutes like ours, which make no mention of mixtures containing controlled substances.
The state cites People v. Davis, 95 Misc.2d 1010, 408 N.Y.S.2d 748 (Dutchess Co.Ct. 1978), for the proposition that aggregation is permissible under a "pure weight" statute. A closer reading of this case should give the state less comfort. The Davis court speculated that aggregation would be permissible under certain circumstances in which "extrapolation" and "statistical analogy" from "test samplings may legally establish the existence of pure marijuana in the unsampled remainder." 408 N.Y.S.2d at 250. But the court went on to warn that "[p]ure weight drugs [such as marijuana] cannot as readily lend themselves to the process of analysis by extrapolation [as heroin]." Moreover, "if marijuana cannot be quantified, then no amount *300 of extrapolation can change that." The court then discussed the New York Statute in words that weigh heavily against the state in the present case:
[T]he legislature converted marijuana to a pure weight standard... ... . . out of the fear that under an aggregate weight analysis, people may find themselves charged with and convicted of large scale or possessory crimes when, in reality, the marijuana constituted only a minute percentage of the entity, say, a two-pound brownie." (408 N.Y.S.2d at 751).
No case was found in which aggregation was clearly rule permissible under a statute like ours, which contains no mention of a "mixture." There is authority to the contrary in Lyons v. State, 455 So.2d 295 (Ala.Cr.App. 1984). Alabama's marijuana statute is similar to ours. In Lyons the defendant was charged with possession of 28 grams or more of cocaine. The evidence showed he had 27.2 grams of pure cocaine and 6.8 grams of "some other substance." Lyons raised the same defense as Drane's in the present case. The Alabama court rejected this because the pertinent statute criminalized possession of the requisite amount of "cocaine or of any mixture containing cocaine." It strongly implied that under the marijuana statute, which contained no mention of a "mixture", the defense would have been successful. 455 So.2d at 297.
The Alabama approach seems sounder than that urged by the state. Surely it would be dubious policy to allow criminal convictions to rest on such gossamer foundations as "extrapolation" and "statistical analogy". Moreover, where the legislature has declined to place a "mixture" containing marijuana within the scope of the statute, the court could not expand the statute to include such mixtures without encroaching on the legislature's domain.
Even under the most expansive possible reading, the state's case against Drane would not necessarily survive. At trial, the state's own expert, an official from the state crime laboratory, proved to be Drane's best witness. After testifying that it was impossible to determine the weight of the marijuana that had been baked into the brownies, she went on to say that there was a "good chance" that the total amount of marijuana seized was less than a kilogram.
All in all, we have little trouble in holding that the state failed to carry its evidentiary burden.
Although we hold that the evidence was insufficient to support a conviction for possession of more than a kilogram, and for intent to distribute, we are of the opinion that it clearly established Drane's guilt of the lesser offense of possessing more than one ounce, but less than one kilogram of marijuana. This offense is set out in a different subsection of the same statute  to-wit: MCA § 41-29-139(c)(2)(C) (Supp. 1985).
In such a case, the proper procedure is to remand for resentencing on the lesser offense. Garvis v. State, 483 So.2d 312 (Miss. 1986); Bryant v. State, 427 So.2d 131, 133 (Miss. 1983); Hollingsworth v. State, 392 So.2d 515, 518 (Miss. 1981).
REVERSED AS TO POSSESSION OF MORE THAN ONE KILOGRAM AND WITH INTENT TO DISTRIBUTE, AFFIRMED AS TO POSSESSION OF MORE THAN ONE OUNCE, BUT LESS THAN ONE KILOGRAM AND REMANDED FOR RESENTENCING.
WALKER, C.J., and ROY NOBLE LEE, and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and GRIFFIN, JJ., concur.