**STATE of Maine**

v.

**Donald SHERBURNE and
Gary Sherburne.**

Supreme Judicial Court of Maine.

Argued Sept. 9, 1989.
Decided March 2, 1990.

R. Christopher Almy, Dist. Atty., Philip C. Worden (orally), and Gregory Campbell, Asst. Dist. Attys., Bangor, for the State.

Robert E. Sandy, Jr. (orally), Waterville, for defendant.

Before McKUSICK, C.J., and WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

CLIFFORD, Justice.

The defendants, Donald and Gary Sherburne, appeal from a decision of the Superior Court (Penobscot County, *Smith, J.*) affirming their convictions in the District Court (Newport, *Cox, J.*) for possession of fish in violation of a regulation of the Department of Inland Fisheries and Wildlife. 12 M.R.S.A. § 7604 (1981).[1] The Sherburnes contend that the evidence used against them, secured as the result of a roadblock conducted by the Maine Warden Service, should have been suppressed. They further maintain that there was insufficient evidence of their possession and that the fine imposed was erroneous. Finding no error, we affirm.

On May 22, 1988, officers of the Maine Warden Service[2] established a roadblock on Route 7, north of Corinna, for the purpose of enforcing fishing laws. The location was chosen by an eighteen-year veteran of the Service based upon his experience that the route was one that was travelled by many fishermen returning from the Greenville area. The particular spot was the site of an earlier roadblock that disclosed numerous violations of Department of Inland Fisheries and Wildlife ("Department") regulations governing size, weight and number of fish. In addition, the area provided adequate space to direct vehicles off the road when required. Approval of the operation, scheduled for a Sunday afternoon during the peak of fishing season, was given by a superior officer before it was conducted.

---

1. 12 M.R.S.A. § 7604 (1981) provides as follows:
   A person is guilty of a violation of a number, amount, weight or size limit if he fishes for or possesses fish in violation of the number, amount, weight or size limits of any rule promulgated by the commissioner.

2. The Maine Warden Service is a bureau within the Department of Inland Fisheries and Wildlife. Among other duties, the Bureau is responsible for the enforcement of state statutes and regulations pertaining to the management and protection of inland fisheries and wildlife resources. 12 M.R.S.A. § 7014 (1981 & Supp. 1989). The wardens have law enforcement authority. 12 M.R.S.A. § 7053 (1981 & Supp. 1989).

In conformity with Policy # 17, the Department's written directive on highway checkpoints and inspections,[3] a sign was posted advising motorists that they would be stopped and inspected by the wardens. A police vehicle was parked beside the southbound travel lane, the site of the checkpoint that was marked by orange safety cones. A supervisory officer situated there made a routine inquiry concerning fishing activity of all vehicles passing through the checkpoint. That officer determined, in light of responses given by the vehicles' occupants and the presence of "obvious signs of fishing activity," whether further inquiry and inspection were warranted. In those instances, vehicles were directed to pull off the highway into an inspection area. There, one of the twelve to fifteen uniformed wardens present conducted further inspections. Sixty violations were detected from the approximately 3200 vehicles that passed through the checkpoint that day.

The Sherburnes were returning from a three-day fishing trip at Lake Chesuncook when they were stopped at the Corinna checkpoint. They were travelling in a truck owned and operated by Donald and towing a motor boat owned by Gary. Since routine inspections were made of any vehicle towing a boat, they were directed to the inspection area off Route 7. After entering the area, Warden David Georgia approached Donald and requested permission to check his fish and his gear. Donald agreed, commenting that they had their "legal limit." Gary produced a cooler containing four foil-wrapped fish for Georgia's inspection. Georgia, accompanied by Gary, proceeded to board the boat. Despite assurances that the cooler contained their total catch, Georgia searched three closed compartments located in the bow of the boat. In the third compartment, Georgia found a plastic bag that contained fifteen salmon on ice. Gary admitted to placing the bag in the compartment but claimed that some of the fish belonged to the other two members of their fishing party who were not present. The defendants were each cited for possession of fifteen fish in excess of Department regulations.[4]

The Sherburnes filed motions to suppress the evidence obtained as a result of the Corinna roadblock. They maintained that their right to be free of unreasonable searches and seizures had been violated by the stop and the ensuing search. The District Court denied these motions, determin-

---

3. Policy #17 provided that:

1. Designated highway checkpoints shall be established and meet with the following criteria:
a. The location adjacent [sic] to an area allowing vehicles to pull off the highway prior to being inspected.
b. Checkpoints to be utilized in the night time hours shall be well lighted.
c. A large sign stating, "Warden Service Fish and Wildlife Checkpoint—All Vehicles Stop" shall be posted on the highway preceding the checkpoint.
d. All vehicles shall be stopped and inspected.
2. Personnel Deployment
a. A supervisory officer shall be present and in charge at the checkpoint to assure that this policy is adhered to and that all precautions are taken to ensure the safety of all persons involved.
b. Vehicles shall be stopped by use of stationary marked departmental cruisers and uniformed Warden Service personnel and directed off the highway to the inspection area.
c. The inspection area shall be allotted an appropriate number of uniformed wardens to carry out inspections and rapidly return vehicles stopped, to the highway.
. . . .
3. Inspection Techniques
a. Once vehicles are stopped, the vehicle will be approached by a uniformed warden who shall identify himself and state the purpose for the stop.
b. Threshold inquiries of all vehicles stopped shall be consistent and initially made by the officers positioned on the highway.
c. In instances when a vehicle and its occupants are to be detained for further inquiry and inspection, the vehicle shall be directed to the inspection area where this will be accomplished.
Me. Dep't of Inland Fisheries & Wildlife, Policy # 17 (1985).

4. The regulation provides that "the daily limit on salmon, trout and togue from any ... inland waters is 10 fish [and] shall not include more than 2 salmon, 2 togue, 3 brown trout [and] 3 rainbow trout." Me. Dep't of Inland Fisheries & Wildlife, *Open Water Fishing Regulations* 09–137 CMR 1 (1988). The regulation prohibits the possession of any more fish than might lawfully be taken in one day. *Id.*

ing that the roadblock was conducted "consistently and reasonably" and that the Sherburnes consented to the search. The court found them guilty and imposed a fine of $325 as to each defendant. Their appeal to this court followed their unsuccessful appeal to the Superior Court.

## I.

■ The roadblock in this case, designed to promote compliance with Maine's fish and wildlife laws and regulations, constitutes a seizure under the Fourth Amendment to the United States Constitution. *State v. Leighton*, 551 A.2d 116, 117 (Me. 1988). It must be tested, as are roadblocks intended to discover and deter motor vehicle violations, by " 'balancing the intrusion on the individual's Fourth Amendment interests against the promotion of legitimate governmental interests'." *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). In deciding whether a brief stop at a regulatory roadblock violates a citizen's fourth amendment rights, this court has considered the reasonableness of the action under the factors set forth in *State v. Deskins*, 234 Kan. 529, 541, 673 P.2d 1174, 1185 (1983). *State v. Cloukey*, 486 A.2d 143, 146 (Me.1985). These are:

"(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test."

*Id.* (quoting *Deskins*, 234 Kan. at 541, 673 P.2d at 1185). Utilizing this approach, we

have upheld those roadblock stops that furthered important governmental objectives when conducted in conformity with procedures that minimize intrusions on protected interests. *State v. McMahon*, 557 A.2d 1324, 1325–26 (Me.1989) (sustaining constitutionality of roadblock designed to discover motor vehicle violations, including OUI drivers); *Leighton*, 551 A.2d at 118 (OUI roadblock); *Cloukey*, 486 A.2d at 146–47 (vehicle safety roadblock); *see also Hatfield v. Commissioner of Inland Fisheries & Wildlife*, 566 A.2d 737, 739 (Me. 1989) ("riverblocks" as actually conducted held unconstitutional).

■ In weighing the governmental interests advanced by a roadblock of this type, we have been consistent with courts of other states and have examined the societal interest in dealing with the issue effectively, the availability of less intrusive means to accomplish the objective and the efficacy of the method chosen. *Cloukey*, 486 A.2d at 146–47; 4 W.R. LaFave, *Search & Seizure* § 10.8(d), at 71–73 (2d ed.1987). The State's interest in conserving its natural resources has been effectuated through pervasive legislation. *See generally* 12 M.R.S.A. §§ 1–9706 (1981 & Supp.1989). We have long recognized that the laws designed to protect and preserve fish and game reflect their "great importance and value to the state." *State v. Snowman*, 94 Me. 99, 112, 46 A. 815, 818 (1900); *see* 12 M.R.S.A. §§ 7001–7954 (1981 & Supp.1989). We note that roadblocks have been upheld elsewhere as a means of enforcing game and wildlife laws designed to promote conservation. *See, e.g., Drane v. State*, 493 So.2d 294, 297 (Miss.1986); *State v. Tourtillott*, 289 Or. 845, 618 P.2d 423, 429–30 (1980), *cert. denied*, 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 352 (1981); *State v. Halverson*, 277 N.W.2d 723, 724–25 (S.D.1979).

In determining whether a less intrusive method would adequately serve the important conservation purpose furthered by a roadblock of this type, we recognize the difficult task with which fish and game enforcement officers are charged. *Tourtillott*, 618 P.2d at 430; *see also Prouse*, 440 U.S. at 664, 99 S.Ct. at 1401–02 (Blackmun, J., concurring); *Drane*, 493 So.2d at

298. That task includes the responsibility for enforcement of fish and game laws with limited numbers of personnel over a wide territory, much of which is uninhabited, and justifies the method chosen. *Tourtillott,* 618 P.2d at 430.

In the case before us, the defendants argue that the roadblock was not conducted reasonably because the wardens failed to comply with the Department's policy directive on highway checkpoints and inspections requiring that all vehicles be stopped and inspected. They maintain that the determination that a further inquiry and inspection was indicated, made by the supervisory officer located at the Route 7 checkpoint, amounts to a discretionary examination of the type condemned in *Prouse.* We disagree. Though Department Policy # 17 provides that all vehicles shall be stopped and inspected, it implicitly countenances that more extensive inquiries may be undertaken through its provision of inspection techniques for both threshold inquiries and further inspections. Moreover, we have approved the use of further inspections where the circumstances have warranted the adoption of that approach. *McMahon,* 557 A.2d at 1325; *see also United States v. Martinez-Fuerte,* 428 U.S. 543, 564–65 & nn. 16–17, 96 S.Ct. 3074, 3085–86 & nn. 16–17, 49 L.Ed.2d 1116 (1976) (border patrol officers' determinations that secondary inspections were indicated upheld where factors relied upon were clearly relevant to purpose of preventing illegal immigration). The trial court's determination that the roadblock was conducted reasonably was based on competent evidence and does not amount to clear error. *State v. Reeves,* 499 A.2d 130, 132 (Me.1985).

## II.

The Sherburnes next contend that the trial court erred in finding that consent was given to the warrantless search of the boat. They argue that any consent given by Donald, the operator of the vehicle, was ineffective to authorize the subsequent search of the boat owned by Gary. They further contend that any consent was given under "inherently coercive" circumstances and thus was presumptively invalid. In order that consent be considered valid, we have required that it be given voluntarily. *State v. Fredette,* 411 A.2d 65, 68 (Me. 1979), by one "with an appropriate relationship to the property searched," *State v. McLain,* 367 A.2d 213, 217 (Me.1976), for a search within its bounds. *State v. Koucoules,* 343 A.2d 860, 867 (Me.1974).

■ Irrespective of whether Donald had either sufficient control or common authority over the boat to make his consent to search the boat binding on Gary, *see State v. Thibodeau,* 317 A.2d 172, 177–78 (Me. 1974), the actions of Gary alone were sufficient to allow the court to infer consent to the search. Gary, the boat's owner, cooperated with the Warden's request to check "fish and gear" by boarding the boat with him and producing the cooler containing their "legal limit." *United States v. Miller,* 589 F.2d 1117, 1131 & nn. 11–12 (1st Cir.1978).

■ The Sherburnes' argument that any consent was not voluntary is based upon the fact that a number of uniformed wardens or police were present in the inspection area to which they were directed and that they were not informed that they might refuse the warden's request. Although there were a number of officers in the area, their activity was not focused exclusively on the Sherburnes. The Sherburne vehicle was only one of 3200 vehicles stopped that day, and only Warden Georgia approached and engaged the Sherburnes while in the inspection area. *Cf. State v. Carter,* 443 A.2d 958, 959–60 (Me.1982); *see also Robbins v. MacKenzie,* 364 F.2d 45, 49 (1st Cir.1966). Georgia testified that he intended to search only if allowed. Further, we have not required that knowledge of a right to object to an officer's request to search is necessary to establish the validity of consent. *Fredette,* 411 A.2d at 69–70 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973)). Competent evidence exists to support the trial court's finding that the search was conducted with the consent of the Sherburnes. *State v. Harriman,* 467 A.2d 745, 747 (Me.1983).

### III.

■ The defendants also contend that there was insufficient evidence of possession. They maintain that the evidence presented failed to establish a specific intent to possess an amount of fish in excess of the daily limit prescribed by regulations.[5] In examining the Sherburnes' contention of insufficient evidence, we review the record in the light most favorable to the State. *State v. Erving*, 558 A.2d 703, 704 (Me.1989).

■ Possession may be established by showing that the defendant had, at sometime, either "immediate physical control ... of [an] object or ... the intention and ability to gain [its] physical control...." *State v. Koehling*, 381 A.2d 12, 14 (Me. 1978). We have held that "the mere *intentional* doing of acts amounting to possession ... give[s] rise to a sufficient culpable mental state required in proof of [fish and game] violations...." *State v. Goyette*, 407 A.2d 1104, 1111 (Me.1979) (emphasis in original). The fact of physical control negates the necessity of proof of those facts required for constructive possession. *State v. Gaudin*, 152 Me. 13, 16, 120 A.2d 823, 825 (1956). Testimony offered at trial established that the fish were concealed inside a plastic bag found aboard a boat owned by Gary Sherburne that was towed by a truck owned and operated by Donald Sherburne. Gary admitted to placing the bag inside the boat locker. Donald · explained that the pair was transporting the fish that belonged to all four members of their fishing party, two of whom were not present. On these facts, sufficient evidence of the pair's possession was introduced to support the court's findings. *State v. Chapman*, 496 A.2d 297, 304 (Me. 1985).

### IV.

■ Finally, we affirm the imposition of a fine on each of the Sherburnes for the total number of fish in excess of that which could lawfully be possessed. A violation of 12 M.R.S.A. § 7604 is a Class E crime. 12 M.R.S.A. § 7901(3) (1981). The maximum fine for a Class E crime is $500. 17–A M.R.S.A. § 1301 (1983). In addition, 12 M.R.S.A. § 7901(3) imposes an incremental fine in the amount of $5 for each fish illegally possessed that may not be suspended. Here, the facts support the trial court's finding that the pair was in joint possession of the fifteen unlawful fish, *see Erving*, 558 A.2d at 704–05, and the total fines imposed, $325 as to each defendant, were well within the maximums provided.

The entry is: Judgments affirmed.

McKUSICK, C.J., and WATHEN, HORNBY and COLLINS, JJ., concurring.

GLASSMAN, Justice, dissenting.

Though cloaked in the same analytical guise, the court's opinion in fact departs from previous cases addressing regulatory stops made without individualized suspicion. The court ignores salient state statutory law and rationalizes the result by a faulty analysis of federal constitutional law. Because I cannot agree that the court's opinion is a correct statement of the law, I must respectfully dissent.

Rules governing the validity of vehicular stops for regulatory inquiry or investigation reduce the probable cause requirement normally adhering to criminal seizures pursuant to the fourth and fourteenth amendments to the United States Constitution. The paternity of such stops may be found in a twin line of United States Supreme Court decisions. One such line of cases derives from *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), which established policies governing street encounters between police officers and persons who piqued an officer's suspicion short of the probable cause necessary for an arrest. The Court held that brief detentions and cursory searches for weapons did not violate the fourth amendment when the deten-

---

**5.** We reject the defendants' related contention that the regulation is so vague that enforcement violates due process.

tion and search was based upon a reasonable and individualized suspicion that the person was armed. While it is true that these decisions primarily analyzed the legality of the search itself, logic dictates that they should also be understood to mean that the actual stop must be based upon these same grounds.

The second line of cases reducing the strict requirements of probable cause deal with administrative or regulatory inquiries or inspections. These cases deal with the requirements for obtaining access to buildings for housing code or safety inspections, *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), or agency inspections of highly regulated businesses. *See, e.g., Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor dealers); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms). The Court made clear that certain inspections based upon lowered probable cause did not offend the fourth amendment because the objectives of the inspections were regulatory, not penal, and because such inspections were based upon regularized administrative procedures that carefully circumscribed any discretion given to officers in the field.[1] Such inquiries are allowed in carefully articulated programs *designed to prevent or correct an existing condition*. While criminal penalties do sometimes attach under these circumstances, they are never the focus of the administrative inquiry.

The two lines merged when the Court subsequently applied the logic of administrative inspections of premises to vehicular stops that serve preventive purposes. In *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court held that permanent checkpoint inspections conducted without individualized grounds for suspicion did not violate the fourth amendment when balanced against the overriding need to prevent illegal immigration. Later commentators rightly categorized such stops as administrative or regulatory, *see* 1 K. Davis, *Administrative Law Treatise* 262 (2d ed. 1978); 3 W. LaFave, *Search and Seizure* § 10.5, at 710 (2d ed.1987), and only incidentally related to criminal enforcement. This distinction is crucial when analyzing stops the State claims are regulatory in nature. For if the method and result of the "regulatory" stop is really penal, then nothing remains of the carefully drawn distinction between ordinary law enforcement seizures requiring individualized suspicion, and preventive and corrective administrative stops that do not.

The Court in *Martinez–Fuerte* also set forth other factors that tipped the balance in favor of the validity of such an administrative program. The Court carefully noted that it confined its decision to *permanent* vehicular checkpoints. *Martinez–Fuerte*, 428 U.S. at 566 n. 19, 96 S.Ct. at 3087 n. 19. The Court observed that a permanent checkpoint eliminated the danger of discretionary enforcement because "[t]he location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources." *Id.* at 559, 96 S.Ct. at 3083. Finally, this type of regulatory practice was justified by the overwhelming problem of illegal immigration, a problem that the Court described in considerable detail. *Id.* at 551–53, 96 S.Ct. at 3080–81. These factors, and the intrusion they represent, are carefully balanced against the privacy interests inherent in the fourth amendment.

---

1. Indeed, the *Camara* court stressed these two themes. The Court stated that " 'probable cause' to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied." 387 U.S. at 538, 87 S.Ct. at 1736, and emphasized that the inspections were by nature preventive and therefore different in kind from ordinary criminal searches. *Id.* at 534–36, 87 S.Ct. at 1733–35. In another case dealing with safety inspections, the Court distinguished the concept of probable cause "in the criminal law sense" from the sense of following the "reasonable legislative or administrative standards" mandated by *Camara*. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978).

The court in the instant case is correct when it states that *regulatory* roadblocks "must be tested ... by 'balancing [the] intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests.'" *State v. Leighton,* 551 A.2d 116, 117 (Me. 1988) (quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). The court, however, fails to analyze whether this particular roadblock is really regulatory in nature, and if so, whether the cases the court cites permit the "balance" struck.

First, the court incorrectly treats the Corinna roadblock as a "regulatory" stop. As I have previously noted, regulatory intrusions on fourth amendment privacy interests are primarily designed to prevent or correct an existing condition. Such existing conditions directly and immediately affect the health, safety and welfare of the citizenry. Accordingly, we have upheld roadblocks designed to discover motor vehicle violations. *State v. McMahon,* 557 A.2d 1324 (Me.1989); drivers operating under the influence, *State v. Leighton,* 551 A.2d 116 (Me.1988); and vehicle safety violations, *State v. Cloukey,* 486 A.2d 143 (Me.1985). In view of the mayhem on our highways, no one can seriously question the need to enforce highway laws and the tragic consequences that can imminently follow the failure to do so. By contrast, violations of sport fishing laws do not generate any comparable threat to human health, safety or welfare justifying such an intrusion. Nor does the stop prevent or correct an existing condition: The fish in question were, after all, dead when seized at the Corinna checkpoint. There was no attempt to instruct or advise fishermen *before* or *while* they fished. The stop of those leaving a large and nebulous target area was for the sole purpose of imposing a penalty.

Second, and closely related to the first point, the court's attempt to balance governmental interests against the demands of the fourth amendment is also found wanting in several important respects. Although pervasive legislation by itself does not create an interest sufficient to justify the intrusion, the court attempts to magnify the governmental interest involved by stating that the "pervasive legislation" "designed to protect and preserve fish and game reflect[s] their great importance to the state." Yet this foundational premise is disposed of in one perfunctory paragraph. In *United States v. Martinez–Fuerte,* relied upon by the court, the United States Supreme Court carefully analyzed the problem of implementing the long and well-established national policy to limit immigration into the United States and convincingly demonstrated the urgency of the government's interest in adopting the least invasive means of implementing this national policy.

The court also ignores salient statutory law governing the legality of fish and game stops. The provision in force in May, 1988, stated that a warden could make a stop if he "[has] reason to believe" that such a violation has occurred. 12 M.R.S.A. § 7053(2)(D) (1981). We held that this language merely incorporates the same requirement of individualized suspicion as do *Terry* criminal stops. *State v. Hillock,* 384 A.2d 437, 440–41 (Me.1978).[2] By P.L.1989, ch. 170, the Legislature repealed section 7053(2)(D) and by P.L.1989, ch. 493, §§ 5, 6, effective June 29, 1989, replaced it by 12 M.R.S.A. § 7053(2)(D–1) (Supp.1989) which states that a uniformed game warden may stop "a motor vehicle or other conveyance, or its operator or occupant" if the warden has a "reasonable and articulable suspicion" that the vehicle or occupant "is or has been involved in" a violation of the fish and game laws. By its terms, this statute demands the usual quantum of individualized suspicion normally applied to stops for criminal law enforcement purposes. Examination of the cases and legislative history

---

**2.** In *Hillock,* we addressed the predecessor statute to section 7053(2)(D), which also stated that a warden must have "reason to believe that a violation" of the fish and game laws has occurred before making a stop. 12 M.R.S.A. § 3051(1) (1974), repealed by P.L.1979, ch. 420, § 5, and replaced by 12 M.R.S.A. § 7053(2)(D). P.L.1979, ch. 420, § 1. Section 7053(2)(D) was repealed by P.L.1989, ch. 170, and replaced by section 7053(2)(D–1). P.L.1989, ch. 493, § 5.

reveals that section 7053(2)(D–1) simply makes specific our previous decision that stops for the purpose of finding fish and game violators are measured by the same standard as any other stop that is criminal in nature. The court fails, however, to address either the new statute or the old. I believe that 12 M.R.S.A. § 7053(2)(D) is, by itself, dispositive and should have been applied by the court.

Third, in view of the subject matter of this stop, the department policy governing the Corinna checkpoint invests excessive discretion in the field officers carrying out the policy. As noted previously, the "'grave danger' of abuse of discretion" always looms in the background of a regulatory stop. *Delaware v. Prouse*, 440 U.S. 648, 662, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660 (1979) (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 559, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976). In *Martinez–Fuerte*, this danger was alleviated because the checkpoints were permanent, and not chosen by field officers and because of the "regularized manner in which [the] established checkpoints are operated...." *Martinez–Fuerte*, 428 U.S. at 559, 96 S.Ct. at 3083. The San Clemente checkpoint had been operated for *24 years*, so it is not difficult to see how such "regularized manners" were developed. *See id.* at 566 n. 19, 96 S.Ct. at 3087 n. 19.

In the present case, the checkpoint was not permanent, and its location was established based upon the discretion of one field officer, and not as the result of considered and thoughtful administrative policy. Department Policy # 17, which governs such checkpoints, is contradictory, stating on the one hand that "[a]ll vehicles shall be stopped and inspected" and on the other hand granting field officers discretion to inspect only selected vehicles.[3] This confusion in policy, resolved by officers in the field, does not "reassure[ ] ... law-abiding motorists, that the stops are duly authorized and believed to serve the public interest." *Id.* at 559, 96 S.Ct. at 3083.

In summary, therefore, the court fails to distinguish between stops for regulatory purposes and those that are purely penal in character, and misapplies the balancing tests normally used to determine the validity of regulatory intrusions. The court ignores controlling statutory law and blurs carefully formulated distinctions while claiming to stand squarely upon established jurisprudence. Accordingly, I would vacate the judgments and remand to the Superior Court for entry of judgments of acquittal for the defendants.

---

3. While it is true that such two-stage inquiries were approved by the Supreme Court in *Martinez–Fuerte*, this technique was practiced according to clearly defined and longstanding policy, and not "in the breach" as here.