STATE of Maine

v.

**Orville PATTERSON, Jr.**

Supreme Judicial Court of Maine.

Argued Sept. 19, 1990.

Decided Nov. 28, 1990.

R. Christopher Almy, Dist. Atty., Jessie Gunther (orally), Asst. Dist. Atty., Bangor, for the State.

John D. Clifford (orally), Huston & Clifford, Freeport, for defendant.

Before McKUSICK, C.J., and WATHEN, GLASSMAN, COLLINS and BRODY, JJ.

McKUSICK, Chief Justice.

The Superior Court (Penobscot County, *Smith J.*) entered judgment on defendant Orville Patterson's conditional plea of guilty to the charge of operating a motor vehicle while an habitual offender, 29 M.R. S.A. § 2298 (Class C) (Supp.1989). On appeal, defendant challenges the denial by the Superior Court (*Browne, A.R.J.*) of his motion to suppress evidence. Defendant contends that a state police officer stopped him at an illegal roadblock that tainted all of the evidence the officer obtained after the stop. We affirm the court's finding that the stop did not violate defendant's right, secured by the Fourth and Fourteenth Amendments of the United States Constitution and article I, section 5, of the Maine Constitution, to be free of an unreasonable seizure.

In the early afternoon of Saturday, September 30, 1989, on Route 178 in Eddington, Maine State Police Officer Barry Curtis conducted a roadblock for the purpose of checking vehicle safety. The uniformed officer parked his plainly marked cruiser in the middle of the road and stopped all cars coming from both directions. At approximately 1:50 p.m., the officer saw a pickup truck stop and change drivers about 100 yards from the roadblock. The driver, defendant Orville Patterson, slid over to the passenger seat, while his passenger, Harold Spann, got out and walked into the trees along the side of the road. When Spann returned to the truck, he got into the driver's seat. The officer stopped the truck when it came up to his cruiser. He asked both men for licenses, but defendant refused to surrender one, saying that he did not have to because he was not driving.

The officer put defendant in the cruiser and ran a license check. On learning that defendant's license had been suspended, Officer Curtis arrested him.

■ We first addressed the constitutionality of a police roadblock in *State v. Cloukey*, 486 A.2d 143 (Me.1985), which involved as does this case a roadblock designed to check traffic safety features. There we distinguished the fixed roadblock from the roving stop held unconstitutional by the United States Supreme Court in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *Cloukey*, 486 A.2d at 145, our analysis "beg[an] with the fundamental question whether the action of the police officers in conducting the roadblock was 'reasonable' under the Fourth Amendment." In finding the safety check roadblock at issue in *Cloukey* reasonable, we adopted the test set forth in *Delaware v. Prouse:*

> "[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."

*State v. Cloukey*, 486 A.2d at 145 (quoting *Delaware v. Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396). All of our subsequent roadblock cases have continued to apply a flexible balancing test between the magnitude of the intrusion and the state interest advanced. *See State v. Sherburne*, 571 A.2d 1181, 1184 (Me.1990) (fish and wildlife roadblock); *State v. McMahon*, 557 A.2d 1324, 1325 (Me.1989) (vehicle safety and OUI roadblock); *State v. Leighton*, 551 A.2d 116, 117 (Me.1988) (OUI roadblock).

We are confirmed in our approach by the United States Supreme Court's decision within the year in *Michigan Dep't. of State Police v. Sitz*, —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), which affirmed the constitutionality of "sobriety checkpoints" or OUI roadblocks conducted by Michigan's state police. *Sitz, id.*, 110 S.Ct. at 2485, applied the balancing test developed in *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979), that

involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. The *Brown* test differs from the two-pronged test in *Delaware v. Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396, that we have traditionally applied to roadblocks, only by considering the prong of "promotion of legitimate governmental interests" in two parts rather than one. For ease of analysis, *Brown* looks at the "gravity" of the public interest as a measure of its legitimacy and at the extent the seizure "advances" the interest as a measure of its promotion. *Brown v. Texas*, 443 U.S. at 51, 99 S.Ct. at 2640. Consequently, on our review of the Superior Court's ruling, we will apply the three-pronged balancing test of *Brown* to the circumstances of the safety check roadblock here at issue. The checklist of thirteen items quoted in *Cloukey*, 486 A.2d at 146, from *State v. Deskins*, 234 Kan. 529, 541, 673 P.2d 1174, 1185 (1983), is nothing more than an identification of factual circumstances that may in varying degrees have bearing on making that balance in a particular case. Consideration of all the circumstances of the roadblock involved in this case persuades us that it passes constitutional muster.

In weighing the gravity of the public concern served by a roadblock and the degree to which it advances the public interest, we examine "the societal interest in dealing with the issue effectively, the availability of less intrusive means to accomplish the objective and the efficacy of the method chosen." *State v. Sherburne*, 571 A.2d at 1184. Our cases have consistently emphasized that the State's vital interest in the health, safety, and welfare of its citizens justifies roadblocks designed to enforce motor vehicle safety laws and to prevent traffic accidents. *See id.* at 1188. The public is best served by a regime that deters drivers from traveling in unsafe vehicles and identifies safety defects before vehicles are involved in accidents. *See State v. Cloukey*, 486 A.2d at 146–47. We have never required the State to show conclusively that the means the police choose

to check for unsafe vehicles is the best of all possible choices. *See State v. McMahon*, 557 A.2d at 1325–26. Because the officer's goal in setting up the roadblock in the case at bar was only to make a visual check of vehicles for safety violations and not to check drivers' licenses and registrations, the method chosen was speedy and at the same time effective. The officer conducted his check during the daytime, on a well-lit, flat stretch of road with visibility of 100 to 150 yards in each direction. He stopped vehicles and checked their headlights, plate lights, tires, and inspection and registration stickers. The officer did not request licenses and registrations except in those instances where the vehicle had an expired sticker. We cannot think of a less intrusive and more effective method of checking for all of these violations at the same time.

Defendant has not demonstrated that the minimal discretion exercised by this officer in conducting a roadblock at which drivers were not asked to show their licenses or registrations was a severe interference with the motorists' liberty interest that automatically tipped the balance against its reasonableness. The officer's safety check took only 1½ to 2 minutes. If the line grew to seven or eight vehicles, he waved all of them through. If he found a vehicle that had a faulty headlight or needed air in its tires, the officer merely warned the driver of the problem and did not issue a citation. The officer also testified that he had conducted this kind of safety roadblock for the four years he had been on the force and that he knew that other state police officers conducted the same type of roadblock in other parts of the state. Without endorsing the proposition that the historical fact of an established police practice always demonstrates its reasonableness, we cannot find that the state police policy of allowing individual officers to conduct this sort of minimally intrusive safety check is unreasonable. The known procedure for conducting these checks worked as a limit on Officer Curtis's discretion. In these circumstances the absence of supervisory personnel in the planning of this specific safety check does not render the limit-ed operation unreasonable. *See State v. Cloukey*, 486 A.2d at 146.

The court's "determination that the roadblock was conducted reasonably was based on competent evidence and does not amount to clear error." *State v. Sherburne*, 571 A.2d at 1185 (citing *State v. Reeves*, 499 A.2d 130, 132 (Me.1985)). Based on the uncontradicted testimony of Officer Curtis, the court was justified in finding that this safety check roadblock effectively promoted the important public interest of highway safety and outweighed the minimal intrusion on individual liberty. *See State v. Cloukey*, 486 A.2d at 147.

■ Since the safety check roadblock was constitutionally reasonable, there is no question that the officer was justified in stopping defendant's truck and asking him for his license. The officer reasonably inferred from the switch in drivers within sight of the roadblock that the original driver was either intoxicated or under suspension and did not want to risk being caught by the police he saw ahead. In the circumstances, the change of drivers objectively suggests defendant's consciousness of guilt. Defendant's action in relinquishing the wheel in advance of a legal roadblock gave rise to a reasonable, articulable suspicion of criminal conduct that amply justified the investigative stop. *See State v. Griffin*, 459 A.2d 1086, 1090 (Me.1983).

The entry is:

Judgment affirmed.

WATHEN, COLLINS and BRODY, JJ., concurring.

GLASSMAN, Justice, dissenting.

Because I conclude that the stop in the instant case was an unreasonable search and seizure, both under federal constitutional law and this court's precedents, I must respectfully dissent. The constitutional validity of the roadblock is the pivotal issue in this case. Absent some reasonable, articulable suspicion or neutral, objective standard, Curtis could not have stopped Patterson. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968);

*State v. Pinkham,* 565 A.2d 318 (Me.1989). If removed from the context of the road-block, Patterson's behavior, as described by Curtis at the motion hearing, could not rise to the level of the furtive or suspicious conduct necessary for a *Terry* stop. *Cf. State v. Griffin,* 459 A.2d 1086, 1090 (Me. 1983). According to Curtis's testimony, he observed a car come to a stop at the side of the road, the passenger leave the vehicle and walk into the woods, the driver slide over into the passenger seat, and the passenger return to the driver's seat and drive up to the roadblock. These acts were allegedly undertaken as a direct result of Patterson's intent to evade detection by the police at the upcoming roadblock. Had Curtis stopped the vehicle because he had observed the same conduct while traveling the road or while parked by the roadside, this court would presumably find that the officer acted without reasonable suspicion for such a "roving stop" because the driver's actions were neither a violation of the law nor did they suggest underlying criminal activity. *See State v. Pinkham,* 565 A.2d at 320. For this reason, the reasonableness of the suspicions articulated by Curtis before the trial court depends directly on the reasonableness of the roadblock. Because a police officer cannot unreasonably create a context to justify his own suspicions regarding an otherwise innocuous act, both the roadblock and the subsequent *Terry* stop were constitutionally unfounded.

Focusing on the validity of the roadblock, the court's opinion properly attempts to balance the relevant state interest against the magnitude of the particular intrusion on the reasonable privacy expectations of those drivers subjected to the roadblock. We have previously recognized that the State has a vital interest in the enforcement of its highway safety laws. *See, e.g., State v. Cloukey,* 486 A.2d 143, 146 (Me. 1985).[1] Where the court seriously departs from our previous decisions is in its analysis of the corresponding "reasonableness" of the intrusion posed by the roadblock. Recognizing that reasonableness must be measured against an "objective standard," *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979), the court asserts that the thirteen factors enumerated in *Cloukey*[2] are merely factual circumstances to be considered, but that the absence of one or more of these factors will not necessarily invalidate the roadblock. *See also State v. Leighton,* 551 A.2d 116, 119 (Me.1988). While this may be an accurate statement of the *Cloukey* test, the amount of discretion allowed the police officer in the field is the crucial underlying criterion behind the determination of reasonableness. *See Michigan Dep't of State Police v. Sitz,* —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). The factors listed in the *Cloukey* decision lose their significance if left to the unsu-

---

1. In employing this balancing test, however, some state interests may be more compelling than others. For example, the state interest in the prevention of drunk driving, which was the linchpin of the recent decision in *Michigan Dep't of State Police v. Sitz,* —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (upholding trial court's finding that state interest was "grave and legitimate"), is arguably greater than the state's interest in inspecting automobiles for safety violations. This fact becomes significant when a court is forced to measure the reasonableness of the stop on the other side of the balance, since a less compelling state interest may necessitate a greater showing of "reasonable" police action. *See id.,* 110 S.Ct. at 2485–86.

2. The *Cloukey* court listed the following factors as an example of the type of objective standard attempted by courts in other jurisdictions:

(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to public at large; (6) advance warning to individual approaching motorist; (7) maintenance of public safety; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.

*State v. Cloukey,* 486 A.2d at 146 (citing *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983)). In the instant case, Curtis's roadblock arguably runs afoul of factors 1, 4, 5, 6, 7, and 10.

pervised whim of one police officer in the field. *Cf. Delaware v. Prouse,* 440 U.S. 648, 655, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *Camara v. Municipal Court,* 387 U.S. 523, 532, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967). Indeed, this is the first case before this court where there is no indication that the police officer's discretion was limited in any actual or quantifiable manner. Officer Curtis testified that he did not follow a written or oral department policy and that no supervisor pre-approved or monitored this roadblock. Instead, Curtis could only point to some ill-defined past police practices. This record raises three problems that the court's opinion does not adequately address.

First, neither current federal constitutional law nor our prior decisions support the validity of a roadblock absent some minimal overall showing that the police officer's discretion in the field was effectively limited. The court's opinion seeks indirect support from the United States Supreme Court's recent decision in *Michigan Dep't of State Police v. Sitz,* — U.S. —, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), but, in this regard, that decision offers no such

confirmation. Although *Sitz* certainly upheld the constitutionality of a sobriety checkpoint, the Court did not depart from the basic tenet that such stops be conducted in conformity with certain pre-established guidelines. *Id.,* 110 S.Ct. at 2487 ("[h]ere, checkpoints are selected pursuant to the guidelines.").[3] Further, our prior decisions dealing with roadblocks have never presented us with a case that disclosed such a total lack of supervision of a police officer in the field.[4] While it is true that we have never required that such guidelines be written, this court has always required some evidence of a neutral standard, evidence noticeably absent from the present record.

Second, the unfettered discretion exercised by Officer Curtis and the inadequate procedures that actually resulted from that exercise in this case illustrate the wisdom of a policy that requires some minimal pre-established guidelines or supervision for a roadblock. Officer Curtis apparently chose the location of the roadblock at random, without any prior approval from or notification of a supervisor, without any indica-

**3.** In *Sitz,* the state police director had appointed a Sobriety Checkpoint Advisory Committee that consisted of representatives of the police force, state prosecutors, and the academic community. This committee then promulgated guidelines for these sobriety checkpoints "setting forth procedures governing checkpoint operations, site selection, and publicity." *Michigan Dep't of State Police v. Sitz,* 110 S.Ct. at 2483–84. The importance attached to these guidelines by the Court, even in the face of the compelling state interest in the detection of drunk drivers, argues for their increased necessity when the state interest is arguably less overriding. Later in the *Sitz* decision, when analyzing the effectiveness of the procedures used, the Court held that *"Brown [v. Texas]* was not meant to transfer from *politically accountable officials to the courts* the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Id.,* 110 S.Ct. at 2487 (emphasis added). It follows from this statement that even the *Sitz* Court contemplated that the neutral guidelines would be implemented by elected government officials accountable to public sentiment and not by police officers in the field.

**4.** We have previously held that a written policy and supervision were "preferable," but not "essential" to a determination that a roadblock was constitutionally valid. *State v. Cloukey,* 486

A.2d at 147. However, in *Cloukey,* the record revealed some evidence of supervision, both as to the existence of the roadblock and advance approval of its location. *See id.* at 144. Similarly, in *State v. Leighton,* 551 A.2d 116 (Me. 1988), the officers conducted the sobriety checkpoint under oral procedures provided by the sheriff's department, and the sheriff directly supervised the operation of the roadblock. *Id.* at 117 ("[t]he procedure used at this roadblock was in accordance with guidelines established in advance by supervisory personnel"). In *State v. McMahon,* 557 A.2d 1324 (Me.1989), the roadblock "followed unwritten procedures established by the Chief of Police and verbally communicated to all involved officers," which included a procedure whereby the first four cars would be directed into a coned-off area and no other cars could be stopped until those four had been checked and waved through. *Id.* at 1325. In *State v. Sherburne,* 571 A.2d 1181 (Me.1990), the roadblock was conducted pursuant to a written directive on highway checkpoints and inspections and was approved by a superior officer. In the instant case, the record fails to disclose how the past police practice regarding roadblocks alluded to by Curtis in any way limited his discretion regarding site location or procedures.

tion that the targeted area was known for an unusual number of safety violations, and without any prior consideration of the potential danger of placing a roadblock on this two-lane road. Curtis failed to mark the area with cones to warn approaching cars of the roadblock or otherwise to set up an area where detained vehicles could be safely parked. The only indication of the roadblock was one police cruiser with flashing lights; from a distance, an approaching driver could reasonably have concluded that the police officer was making a routine one-car traffic stop. Nor was this a fixed, permanent checkpoint, such as those approved to prevent illegal immigration, that gives the public at large prior notice of its existence. *Cf. United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).[5] Finally, Curtis testified that when it appeared to him that the traffic had accumulated at the roadblock, he would wave the cars through without an inspection. Although this procedure was presumably used to limit the intrusiveness and inconvenience of the roadblock, no pre-determined guideline mandated how many cars could accumulate in line before Curtis waved them through the roadblock. The facts of this case illustrate the practical consequences of this type of unfettered, spontaneous discretion.

Third, the absence of such minimal guidelines or supervision converts the present roadblock into the functional equivalent of a "roving stop." The presence of an explicit, neutral policy or supervision is designed in part to prevent an individual police officer from creating some pretext to stop automobiles without an individualized suspicion. While it is true that explicit, neutral guidelines or supervision will not always prevent a pretextual roadblock, without guidelines or supervision such a "subterfuge" remains largely undetectable

and the roadblock is virtually impervious to any challenge to its legality. If a single police officer decides the purpose of a roadblock and where to locate and how to conduct it, the subsequent procedures used are tainted by the arbitrariness of that initial decision. On the other hand, when there is evidence of explicit, neutral guidelines or supervision, the factors enumerated in *Cloukey* come into play to measure whether those policies or orders, and the execution of them by the officers in the field, were indeed objectively reasonable. Without any means to determine the objective reasonableness of this roadblock, it is impossible to distinguish this roadblock from the so-called "roving stop," except that the police officer is in a fixed position while awaiting the target automobile.

In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court held that the police officer making a stop must either have an independent articulable suspicion or follow a substantial and objective standard or rule, pursuant to "previously specified 'neutral criteria.' " *Id.* at 661, 99 S.Ct. at 1400. A roadblock stop, not based on any individualized suspicion, must therefore be conducted pursuant to a previous guideline. The balancing test set out in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), even in light of the *Sitz* decision, is premised on the "individual's right to personal security free from *arbitrary interference* by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *see also Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) ("[t]he essential purpose in the Fourth Amendment is to impose a standard of 'reasonableness' upon the discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of indi-

---

**5.** The Court has approved stops at fixed checkpoints because they prevent any unfair surprise to drivers. Similarly, the *Sitz* Court had before it an appeal from a declaratory judgment, instituted *before* the sobriety checkpoints at issue had taken place. *See Michigan Dep't of State Police v. Sitz*, —— U.S. ——, ——, 110 S.Ct. 2481, 2498–99, 110 L.Ed.2d 412 (1990) (Stevens, J., dissenting). The checkpoints, conducted pursu-

ant to stringent guidelines, had been extensively prepublicized in the media. In fact, the state police welcomed this publicity for its deterrent effect in keeping drunk drivers off the roads. For this reason, the *Sitz* decision offers little guidance regarding the issue of proper notice to drivers in cases dealing with unpublicized roadblocks.

viduals against arbitrary invasions.' "). Although the level of intrusion experienced by a driver in a capricious roadblock may be less than that experienced in a "roving stop," this fact alone cannot excuse the circumvention of the general principle that a police officer cannot stop an automobile without a reasonable, articulable suspicion or without some previously specified objective criteria governing the reasonableness of that stop. In the instant case, because the determination regarding the reasonableness of the roadblock was clearly erroneous, Officer Curtis may not take advantage of the unreasonable roadblock to provide a contextual framework for his claim that he had a reasonable, articulable suspicion to believe that Patterson's intent in switching seats with his passenger was to avoid detection at the roadblock. "When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." *Cf. Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). Because it is precisely the function of this court to define such limits, I would vacate the judgment.