2011 ME 42

**STATE of Maine**

v.

**Tara L. KENT.**

Supreme Judicial Court of Maine.

Argued: Feb. 8, 2011.
Decided: March 29, 2011.

George A. Hess, Esq. (orally), Auburn, ME, for Tara L. Kent.

Norman R. Croteau, District Attorney, Nicholas S. Worden, Asst. Dist. Atty. (orally), Office of the District Attorney, Auburn, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] Tara L. Kent appeals from a judgment of conviction of operating under the influence (Class D), 29–A M.R.S. § 2411(1–A)(B)(1) (2010), entered in the Superior Court (Androscoggin County, *Clifford, J.*) after a jury trial. Kent contends that the court erred when it denied her motion to suppress because the OUI roadblock stop that led to her arrest was an unreasonable seizure of her person in violation of the Fourth Amendment. Because we conclude that the State did not meet its burden of establishing at the motion hearing that the roadblock stop was constitutionally reasonable, we vacate the judgment.

## I. BACKGROUND

[¶ 2] The following facts, viewed in the light most favorable to support the court's order, are established in the motion to suppress record. *See State v. Lavoie*, 2010 ME 76, ¶ 2, 1 A.3d 408, 410. Sergeant Rielly Bryant of the Androscoggin County Sheriff's Department was the only witness to testify at the motion hearing. Between 10 p.m. and 2 a.m. on December 11 and 12, 2009, the Auburn Police Department, the Lewiston Police Department, and the Androscoggin County Sheriff's Department jointly conducted an OUI roadblock in Auburn. The written standard operating procedures (SOPs), established by the Chief of the Auburn Police Department, applied to the operation of the roadblock. The SOPs provide in relevant parts:

The Chief of the Auburn Police Department shall approve any requests to hold a sobriety checkpoint.

. . . .

The location of a sobriety checkpoint shall be chosen after consideration of [several factors related to safety and efficiency and the frequency and location of prior OUI related accidents and arrests].

. . . .

The public shall be notified via the media of any plan to hold a sobriety checkpoint at least 24 hours prior to holding the checkpoint.

. . . .

A minimum of one supervisor and six patrolmen will be used at all sobriety checkpoints.

. . . .

All vehicles passing through the sobriety checkpoint shall be stopped. Only when backed up traffic becomes a hazard will vehicles be allowed through without being checked, and in this case all vehicles will be let through until there is no longer a hazard.

. . . .

Each operator will be given a message card and will be spoken to only briefly. If there is no reason to believe a violation is occurring, then the vehicle will be allowed to continue without further delay.

[¶ 3] The Auburn Police Department was the agency in charge of setting up the roadblock. Sergeant Bryant had participated in six or seven previous roadblocks, which had been set up in the same location and in the same manner as the December 11–12 roadblock. Prior to the commencement of this roadblock, Bryant and other officers on site discussed the procedures for the roadblock. The initial point of the roadblock was set up at the end of the

Longley Bridge in Auburn. One officer was stationed there with a marked police vehicle, signage, and traffic cones to divert vehicles to a checkpoint area, which was set up in a large nearby parking lot. A second officer, wearing a reflective vest, made sure that diverted vehicles entered the checkpoint. Several officers, including Bryant, were stationed in the checkpoint to conduct sobriety checks. If all officers in the checkpoint area were occupied with vehicles, the second officer would communicate that information to the officer on the bridge, and drivers would be allowed to continue on the road without being diverted.

[¶ 4] At the checkpoint area, Sergeant Bryant identified drivers who were diverted to his station, checked them for signs of intoxication, and ran basic license checks. If there were no violations, the driver was allowed to drive away; if Bryant found a violation, he had the driver pull off to the side for further investigation. The average length of time that a driver with no violations spent at the checkpoint was three to five minutes.

[¶ 5] Sergeant Bryant's testimony did not address the precise number of officers used at the roadblock or whether, as required by the SOPs, the Chief of the Auburn Police Department had approved any requests to conduct a roadblock at this location, the public was notified in advance of this roadblock, or a supervisor was present at this roadblock. While Bryant was occupied with a vehicle at his checkpoint station, he was not aware of what the other officers were doing or how other vehicles were being stopped.

[¶ 6] That night, Kent was driving a car that was diverted to Sergeant Bryant in the checkpoint area. Based on the odor of alcohol coming from Kent's vehicle, Kent's bloodshot and glassy eyes, and her failure to perform an alphabet recitation test successfully, Sergeant Bryant had her pull to the side for further sobriety testing. Kent performed additional field sobriety tests poorly, and a subsequent Intoxilyzer test indicated that her alcohol level was above the statutory limit.

[¶ 7] In January 2010, Kent was charged by complaint with criminal OUI with one previous OUI offense within a ten-year period (Class D), 29–A M.R.S. § 2411(1–A)(B)(1). In February, Kent challenged the legality of the stop by moving to suppress all evidence obtained from the stop. At a June 2010 suppression hearing, the court found that the roadblock was performed pursuant to the Auburn Police Department's standard operating procedures. The court concluded that the roadblock stop was proper, and it denied Kent's motion.

[¶ 8] After a jury convicted Kent of OUI, she was fined $800, sentenced to serve seven days in jail, and received a three-year suspension of her right to operate. This appeal followed.

## II. DISCUSSION

[¶ 9] Kent argues that the seizure of her person at the roadblock stop was constitutionally unreasonable because the State did not establish that, as required by the SOPs, (1) the roadblock was approved by the Chief of Police; (2) a supervisor was present at the roadblock; and (3) all vehicles passing through the roadblock were stopped.

 [¶ 10] At a hearing on a motion to suppress, the State bears the burden of demonstrating that the execution of a roadblock stop by police officers was reasonable pursuant to the Fourth Amendment. *See State v. Sylvain,* 2003 ME 5, ¶ 7, 814 A.2d 984, 986; *State v. Patterson,* 582 A.2d 1204, 1205 (Me.1990). We review the court's factual findings for clear error and its conclusions of law de novo. *State*

*v. Bjorkaryd–Bradbury*, 2002 ME 44, ¶ 9, 792 A.2d 1082, 1084. To determine whether an OUI roadblock stop was constitutionally reasonable, we balance the intrusion on a person's Fourth Amendment liberty interests against the public interests at stake. *State v. Leighton*, 551 A.2d 116, 117–18 (Me.1988).

[¶ 11] We have long recognized "[t]he State's undeniably strong interest in protecting the public from the threat of drunk drivers on our highways." *Id.* at 118. Here, we are concerned with the other side of the scale: the reasonableness of the intrusion created by a roadblock stop. In *State v. Cloukey*, we identified a number of factors to evaluate the reasonableness of a roadblock stop:

(1) [t]he degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.

486 A.2d 143, 146 (Me.1985) (quotation marks omitted). This list of factors is not an equally-weighted checklist; it merely identifies factual circumstances that apply in varying degrees to the balancing test employed in each individual case. *Patterson*, 582 A.2d at 1205.

[¶ 12] Accordingly, in the context of the balancing analyses in other roadblock cases, we have discounted some of these factors. For instance, where unwritten procedures established by a law enforcement agency were communicated to the officers conducting a roadblock and there was on-site supervision, we have held that the absence of written procedures and advance notice to the public did not render a roadblock stop constitutionally unreasonable. *See State v. McMahon*, 557 A.2d 1324, 1325–26 (Me.1989); *Leighton*, 551 A.2d at 116–17, 119. Similarly, we have held that the absence of supervision in planning stages did not render a single-officer safety check roadblock unconstitutional where the officer followed established police procedures. *Patterson*, 582 A.2d at 1204, 1206; *see also Cloukey*, 486 A.2d at 146, 147 (holding that absence of written policy and supervision in the planning stages did not render a safety check roadblock unconstitutional where the Sheriff gave permission for the roadblock and the purpose of the roadblock was not a subterfuge).

[¶ 13] These cases might suggest that the absence of some of the *Cloukey* factors does not render the roadblock stop unconstitutional. However, among the totality of the circumstances considered, some evidence of accountability, oversight, or adherence to protocol is required to ensure that the public's privacy interest was considered in the design and execution of a roadblock.

[¶ 14] In this case, the State did not establish that there was *any* leadership or accountability in the design, approval, and execution of the roadblock. Although Sergeant Bryant testified that he had participated in the six or seven previous roadblocks that were set up in the same location and in the same manner, there was no direct evidence that the roadblock's location was chosen according to the criteria set forth in the SOPs. Nor did the State establish that the Chief of the

Auburn Police Department or any other authority approved a request to conduct any of these roadblocks or that the public was notified in advance of this roadblock. With respect to supervision of the roadblock, Sergeant Bryant did not testify about who supervised the roadblock or whether a supervisor was even present.

[¶ 15] Reviewing the other *Cloukey* factors, the average length of time that motorists were detained at this roadblock is notable. One SOP provides, "Each operator will be given a message card and will be spoken to only briefly." However, at this roadblock, motorists without violations were detained an average of three to five minutes. Compared to the average time of detentions in cases where roadblocks were deemed reasonable, the length of these seizures suggests more than a minimal intrusion of a motorist's liberty interest. *See Bjorkaryd–Bradbury*, 2002 ME 44, ¶ 3, 792 A.2d at 1083 (safety checks lasting "only a couple of minutes"); *Patterson*, 582 A.2d at 1206 (safety checks taking "only 1 1/2 to 2 minutes"); *State v. Babcock*, 559 A.2d 337, 337 (Me.1989) (OUI detentions lasting one to two minutes); *McMahon*, 557 A.2d at 1325 (safety and OUI detentions lasting "one to two minutes"); *Leighton*, 551 A.2d at 117 (OUI stops lasting "under a minute"); *Cloukey*, 486 A.2d at 144 (conducting thirty safety checks in one-half hour); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 448, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (sobriety checkpoint stops lasting an average of twenty-five seconds).

[¶ 16] Ultimately in our balancing analysis, the "crucial underlying criterion" of reasonableness is the amount of discretion that a police officer is allowed to exercise in conducting a stop. *Patterson*, 582 A.2d at 1207–08 (Glassman, J., dissenting); *see Cloukey*, 486 A.2d at 146; *Delaware v. Prouse*, 440 U.S. 648, 661–63, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Indeed, we have never upheld the constitutionality of a roadblock stop without first determining that the involved officers' discretion was appropriately limited. *See Bjorkaryd–Bradbury*, 2002 ME 44, ¶ 18, 792 A.2d at 1086; *Patterson*, 582 A.2d at 1206; *State v. Sherburne*, 571 A.2d 1181, 1185 (Me.1990) (concluding that inspection at a fish and wildlife roadblock was not discretionary); *Babcock*, 559 A.2d at 337; *McMahon*, 557 A.2d at 1325; *Leighton*, 551 A.2d at 118, 119; *Cloukey*, 486 A.2d at 144.

[¶ 17] In his role at the checkpoint, Sergeant Bryant had no discretion related to which vehicles were stopped; he identified and checked all drivers that were diverted to his station. On the other hand, the officer on the bridge who was diverting traffic to the checkpoint was in a position to exercise discretion as to which vehicles he diverted. The standard operating procedure related to stopping vehicles is designed to minimize that officer's discretion by requiring the officer to stop all vehicles until backed-up traffic becomes a hazard. However, Sergeant Bryant—the only witness to testify at the motion hearing—did not have first-hand knowledge of how the officer on the bridge actually directed traffic that night or whether the officer followed the SOPs. The State thus offered no evidence on this crucial question.

[¶ 18] The court inferred from Sergeant Bryant's testimony that all of the officers involved in the roadblock followed the SOPs. However, because there was neither percipient testimony from the officer on the bridge or a supervisor on duty, nor evidence that the Chief of Police approved the roadblock, that there was a supervisor on site, or that the SOPs were adhered to in several other important aspects, the evidence in the motion record did not support the court's inferred finding. Accordingly, this was clear error.

[¶ 19] Although we have acknowledged "the lower expectation of privacy tradition-

ally accorded to the motoring public," *Leighton*, 551 A.2d at 118 (quotation marks omitted); *Babcock*, 559 A.2d at 337, at its core, the Fourth Amendment still protects motorists from investigatory seizures conducted through the standardless and unconstrained exercise of discretion of police officers, *Leighton*, 551 A.2d at 117, 119; *Prouse*, 440 U.S. at 661–63, 99 S.Ct. 1391. To strike a fair balance between the State interest involved here and the public's right to be free from intrusion of their privacy requires a showing that law enforcement officers, in the planning and execution of roadblock stops, adhered to procedures designed to protect the public's Fourth Amendment rights.

[¶ 20] In this case, although it is possible that the stop was not unreasonable because the law enforcement officers involved did, in fact, comply with the SOPs, no evidence was presented to the court from which those facts could be found. Simply put, the State failed to meet its burden to demonstrate that the roadblock stop was actually planned or executed in a manner consistent with the Fourth Amendment. As a result, the court erred in denying Kent's motion to suppress, and the evidence obtained as a result of the roadblock stop should have been suppressed.

The entry is:

Judgment vacated. Remanded for further proceedings consistent with this opinion.