2012 ME 105

**STATE of Maine**

v.

**Daniel WHITNEY.**

Supreme Judicial Court of Maine.

Submitted On Briefs: June 27, 2012.
Decided: Aug. 7, 2012.

Jeffrey C. Toothaker, Esq., Toothaker & Chong, Ellsworth, for appellant Daniel Whitney.

Carletta M. Bassano, District Attorney, and Mary N. Kellett, Asst. Dist. Atty., Prosecutorial District No. VII, Ellsworth, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: LEVY, SILVER, MEAD, and GORMAN, JJ.

Dissent: SAUFLEY, C.J., and ALEXANDER, J.

MEAD, J.

[¶ 1] Daniel Whitney appeals from a judgment of conviction of one count of operating under the influence (Class D), 29–A M.R.S. § 2411(1–A)(B)(1) (2011), entered in the District Court (Ellsworth, *Mallonee, J.*) following his conditional guilty plea. Whitney argues that the court (*A. Murray, J.*) erred in issuing an order denying his motion to suppress evidence derived from a police officer's stop of his vehicle. Because we conclude that the stop was unconstitutional, we vacate the judgment and the order denying the motion to suppress.

## I. BACKGROUND

[¶ 2] The following facts are not disputed. On November 13, 2010, around 1:40 a.m., Officer Shawn Willey of the Ellsworth Police Department responded to the scene of a single-vehicle accident on Christian Ridge Road in Ellsworth. The vehicle had gone off the road and struck a utility pole; it was on its roof and its windows were broken. The individual who reported the accident had also informed the dispatcher that a male was walking on Christian Ridge Road away from the accident scene towards Red Bridge Road. By the time Officer Willey arrived, the vehicle's operator was gone and he did not observe anyone walking on Christian Ridge Road. He also did not observe any blood at the scene.

[¶ 3] Officer Willey was unable to determine who owned the vehicle based on its registration information because the person who had registered it was no longer the vehicle's owner. Officer Willey attempted to track the operator from the accident scene with his police dog. The dog led him to an area near Red Bridge Road, but then lost the scent. Officer Willey explained that after the unsuccessful track, he and another officer "began doing a roving patrol in the area, trying to locate somebody in case they were still on foot." He stated that the purpose of the "roving patrol" was to "make sure that, A, they didn't need any medical attention, they weren't injured, and, B, they were involved in the criminal act of leaving the scene of an accident." [1]

---

1. Officer Willey used the phrase "leaving the scene of an accident" to describe the crime he believed the vehicle's operator was committing, but also testified that the accident was a reportable one because of the amount of damage the vehicle had sustained. *See* 29–A M.R.S. § 2251(8)(A) (2011). Leaving the scene of an accident involving death or bodily injury is a separate offense from failure to report an accident. *See* 29–A M.R.S. § 2252 (2011). The State argued during the hearing on the motion to suppress that the crime Officer Willey was investigating was failure to report an accident. The motion court, in its written order, however, referred to the crime under investigation as "leaving the scene of

[¶ 4] Around 3 a.m., Officer Willey spoke with the occupants of a vehicle at the intersection of Christian Ridge Road and Red Bridge Road who informed him that they had seen several men walking on Red Bridge Road. Officer Willey proceeded along Red Bridge Road for three or four miles and located three men on the side of the road who were speaking to the driver and passenger of a vehicle that had pulled up alongside them and stopped. Officer Willey pulled up behind the stopped car but did not activate his blue lights or siren. He testified that he did not observe anything illegal about the vehicle, nor had it committed any traffic violations.

[¶ 5] As Officer Willey began speaking with the pedestrians, he observed that the vehicle was about to drive away and instructed the driver, Daniel Whitney, to "wait here"; he acknowledged that at that point, Whitney was not free to leave. Officer Willey explained that he instructed Whitney not to leave because he "just wanted to verify that he wasn't involved in the crash, or he had a passenger with him and make sure that he hadn't picked somebody up along the way from the crash." Whitney waited for three or four minutes while Officer Willey conversed with the pedestrians. After Officer Willey determined that the pedestrians had recently left a party and were not involved in the accident, he turned his attention to Whitney. In speaking with Whitney, Officer Willey detected the odor of intoxicating beverages and noticed an open can of beer in the vehicle. These events ultimately led to Whitney being charged with operating under the influence.

[¶ 6] On June 29, 2011, Whitney filed a motion to suppress all the evidence ob-

tained from Officer Willey's stop, arguing that the stop was not justified because Officer Willey had not observed any illegal activity prior to instructing Whitney not to leave. Following a hearing, the court denied the motion to suppress in a written order on November 3, 2011. The court found that there was no articulable suspicion that Whitney was committing a crime or a traffic violation before Officer Willey told him to "wait here" and that Officer Willey had instructed Whitney not to leave because Officer Willey "wanted to verify that neither [Whitney or his passenger] had been involved in the crash."

[¶ 7] The court then analyzed whether Whitney's seizure was reasonable pursuant to the Fourth Amendment for information-seeking purposes, applying the *Brown v. Texas* three-factor test adopted in *State v. LaPlante*, 2011 ME 85, ¶ 9, 26 A.3d 337. The court determined that the gravity of the public concern regarding the misdemeanor crime under investigation was greater than in *LaPlante*, which involved a civil speeding infraction. It then concluded that Whitney's seizure three or four miles from the accident scene, ninety minutes after Officer Willey's arrival at the scene, was "reasonably related to advancing the investigation." Finally, the court determined that those two factors outweighed the interference with Whitney's liberty interest.

[¶ 8] Whitney entered a conditional guilty plea on December 19, 2011, following the denial of his motion to suppress, preserving his right to appeal the motion court's decision. He then brought this appeal.

an accident, a serious, reportable accident." No evidence was presented during the hearing that the accident produced bodily injury or death; evidence was introduced, however, that the accident was reportable. As a result, we conclude, for purposes of this opinion, that the crime being investigated was failure to report an accident.

## II. DISCUSSION

### A. Fourth Amendment Standards

■ [¶ 9] When the facts before the motion court are not disputed, "we review the denial of the motion to suppress de novo as to issues of law." *LaPlante,* 2011 ME 85, ¶ 6, 26 A.3d 337. A seizure violates the Fourth Amendment of the United States Constitution and article I, section 5, of the Maine Constitution if it is unreasonable. *Id.* ¶ 8. "In almost all circumstances, a warrantless seizure is unreasonable in the absence of an objectively reasonable, articulable suspicion that criminal conduct has taken place, is occurring, or imminently will occur." *Id.* (quotation marks omitted). Even a brief, limited governmental intrusion for the purpose of investigation must be justified at its inception by a showing of reasonable suspicion. *See State v. Langlois,* 2005 ME 3, ¶ 7, 863 A.2d 913 (citing *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). However, a seizure for information-seeking purposes may be reasonable in particular circumstances even in the absence of reasonable articulable suspicion of criminal conduct.[2] *LaPlante,* 2011 ME 85, ¶ 8, 26 A.3d 337.

■ [¶ 10] The United States Supreme Court has explained that "special law enforcement concerns will sometimes justify highway stops without individualized suspicion." *Illinois v. Lidster,* 540 U.S. 419, 424, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (citing *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *United States v. Mar-*

*tinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)). Nevertheless, the Fourth Amendment requires that such stops still be reasonable "on the basis of the individual circumstances." *Id.* at 426, 124 S.Ct. 885. "[I]n judging reasonableness, we look to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Id.* at 427, 124 S.Ct. 885 (quoting *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)); *see also LaPlante,* 2011 ME 85, ¶ 8, 26 A.3d 337 (articulating the *Brown* factors).

[¶ 11] At the outset, we recognize that the United States Supreme Court has distinguished information-seeking stops at highway checkpoints from random suspicionless stops associated with roving patrols. *See Sitz,* 496 U.S. at 454–55, 110 S.Ct. 2481 (distinguishing formalized sobriety checkpoint stops from random stops which involve standardless and unconstrained police discretion); *Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) ("For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles . . . and those stops occasioned by roadblocks where all vehicles are brought to a halt . . . and all are subjected to a show of the police power of the community."); *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. 3074 ("[T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Rov-

---

2. A stop may also be justified in the absence of reasonable articulable suspicion of criminal conduct "when an officer's assessment of the existence of specific and articulable facts indicating a possible . . . public safety risk is objectively reasonable considering the totality of the circumstances." *State v. Connor,* 2009 ME 91, ¶ 10, 977 A.2d 1003. Although Offi-

cer Willey initially expressed concern for the driver's safety, he did not testify to any specific and articulable facts concerning his observations of Whitney, his passenger, or the condition of Whitney's vehicle that would justify the stop for purposes of public safety, and the motion court did not consider reasonable safety concerns as a justification for the stop.

ing patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists." (quotation marks omitted)).

■ [¶ 12] Officer Willey was engaged in a roving patrol ninety minutes after his arrival at the scene of the accident in an attempt to locate the vehicle's operator, who he believed was engaged in criminal conduct, when he seized Whitney. Officer Willey testified that he did not observe any illegal conduct prior to seizing Whitney, and he stated that he told Whitney not to leave because he "just wanted to verify that he wasn't involved in the crash, or he had a passenger with him and make sure that he hadn't picked somebody up along the way from the crash." The motion court also found that there was no reasonable articulable suspicion to justify the stop and that Officer Willey seized Whitney because he "wanted to verify that neither [Whitney or his passenger] had been involved in the crash." Officer Willey's random, suspicionless stop of Whitney in an attempt to locate a criminal suspect is significantly distinguishable from a highway checkpoint stop aimed at gathering information from the public. *See Lidster*, 540 U.S. at 428, 124 S.Ct. 885 (Stevens, J., concurring in part and dissenting in part) (explaining that there "is a valid and important distinction between seizing a person to determine whether she has committed a crime and seizing a person to ask whether she has any information about an unknown person who committed a crime"); *see also State v. Gorneault*, 2007 ME 49, ¶ 9, 918 A.2d 1207 (explaining that a police roadside checkpoint in the area where a crime had recently been committed was constitutional in part because the "purpose of the brief stop and the inquiry was not to determine if the drivers themselves committed a crime"). Sanctioning the

stop here would grant law enforcement unfettered discretion to randomly stop any given motorist more than an hour after a crime has been committed, in the absence of any reasonable articulable suspicion of criminal conduct, on the chance that the vehicle's occupants may have had something to do with the crime. The Fourth Amendment prohibits that result. *See State v. Kent*, 2011 ME 42, ¶ 19, 15 A.3d 1286 ("[A]t its core, the Fourth Amendment ... protects motorists from investigatory seizures conducted through the standardless and unconstrained exercise of discretion of police officers.").

### B. *Brown v. Texas* Three–Factor Test

[¶ 13] Whitney's seizure was also unreasonable pursuant to the three-factor test articulated in *Brown*. As we have explained, pursuant to *Brown*, "a seizure for information-seeking purposes may be reasonable if the gravity of the public concerns served by the seizure and the degree to which the seizure advances the public interest outweigh the severity of the interference with individual liberty." *LaPlante*, 2011 ME 85, ¶ 8, 26 A.3d 337 (alteration and quotation marks omitted).

### 1. Gravity of the Public Concern

[¶ 14] We acknowledged in *LaPlante* that the investigation of serious crimes such as fatal hit-and-run accidents, burglaries, and robberies have "been deemed sufficiently important to outweigh certain interferences with the liberty interests of stopped motorists." *Id.* ¶ 11. In contrast, we observed that a civil speeding infraction did not present a similarly grave public concern. *Id.* ¶ 13. The crime here, failure to report a non-fatal accident, although more serious than a civil speeding infraction, is a Class E misdemeanor. *See* 29–A M.R.S. § 2251(8)(A) (2011). Accordingly, this crime, although of greater concern

than a civil speeding infraction, does not present a matter of grave public concern similar to the more serious felony offenses we have discussed in our prior decisions. *See LaPlante*, 2011 ME 85, ¶ 13, 26 A.3d 337.

### 2. The Degree to Which the Stop Advances the Public Interest

[¶ 15] In *LaPlante*, we acknowledged that "motorist stops may significantly advance the investigation of serious crimes in cases where motorists are stopped soon after the crime and in the vicinity where the crime occurred because the stopped motorist might well have been in the vicinity of the crime at the time it occurred." *Id.* ¶ 14 (quotation marks omitted). Here, however, the stop of a motorist three to four miles from the scene of a single vehicle accident, at least ninety minutes after the accident occurred, is unlikely to significantly aid an investigation into whether the vehicle's operator has reported the accident to the proper authorities. Moreover, the vehicle's operator can usually be identified and located by obtaining the vehicle's readily available registration information. *See, e.g., State v. Prescott*, 2012 ME 96, ¶ 3, 48 A.3d 218. Thus, even though the information produced from the registration information here did not lead directly to the vehicle's operator, the availability of such information from a vehicle that has been abandoned at the scene of an accident renders an information-seeking stop of a motorist unnecessary and of little value in investigating the crime at issue here.

### 3. The Severity of the Interference with Individual Liberty

[¶ 16] Courts have upheld information-seeking highway stops when "the stop is brief, unlikely to cause anxiety, and planned ahead so as to minimize officer discretion in the field." *LaPlante*, 2011 ME 85, ¶ 17, 26 A.3d 337; *see, e.g., Gorneault*, 2007 ME 49, ¶¶ 2–3, 9, 918 A.2d 1207 (finding a roadblock stop constitutional when police stopped every vehicle at the roadblock, each stop was brief and questions were limited to those relating to a recently committed burglary, and overall the stop was "unlikely to cause alarm or anxiety"). Even so, we have recognized that traffic stops intrude on a person's liberty to a degree that is not insubstantial. *LaPlante*, 2011 ME 85, ¶ 16, 26 A.3d 337. Indeed, we concluded in *LaPlante* that the officer's stop in that case significantly interfered with LaPlante's liberty interest because "there were no formal restrictions on the trooper's exercise of discretion, and, under the circumstances of the stop, there was a significant potential to cause alarm and anxiety." *Id.* ¶ 21. We explained that the information-seeking stop in that case was "in all salient respects, a function of the trooper's individual discretion" and "more likely to cause alarm and anxiety than a roadblock stop because upcoming roadblocks are clearly visible, whereas LaPlante had no indication that he would be stopped." *Id.* ¶ 20.

[¶ 17] Here, as in *LaPlante*, there was no formal restriction on Officer Willey's discretion and the stop had a significant potential to cause alarm and anxiety. Officer Willey's seizure of Whitney was made in the absence of any oversight or accountability, and Whitney was required to wait until Officer Willey had finished with the pedestrians before learning the nature and purpose of his detention. *See Kent*, 2011 ME 42, ¶¶ 14–16, 15 A.3d 1286 (explaining that the "crucial underlying criterion of reasonableness is the amount of discretion that a police officer is allowed to exercise in conducting a stop" and concluding that the detention of motorists at a roadblock for "an average of three to five minutes[,]" in the absence of any "leadership or ac-

countability in the design, approval, and execution of the roadblock[,]" suggested "more than a minimal intrusion of a motorist's liberty interest" (quotation marks omitted)). Furthermore, the stop was the result of a roving patrol conducted at an early morning hour and Whitney had no indication that law enforcement was present because Officer Willey pulled up behind him in the dark without engaging his siren or blue lights. *See LaPlante*, 2011 ME 85, ¶ 20, 26 A.3d 337; *see also Sitz*, 496 U.S. at 453, 110 S.Ct. 2481 (explaining that roving patrols usually take place at night and "their approach may frighten motorists[,]" whereas, at a checkpoint stop, motorists can see other vehicles being stopped and can observe visible signs of the police officers' authority (quotation marks omitted)). Sanctioning this seizure would significantly expand the discretion of an officer on an unsupervised roving patrol to seize motorists who otherwise are committing no offense and have no apparent involvement in, or knowledge of, relatively minor crimes that have occurred in an area distant from where the stop occurs.

## III. CONCLUSION

[¶ 18] In summary, we conclude that because Whitney was seized in the absence of any reasonable articulable suspicion of criminal conduct during a police officer's roving patrol, the seizure was unconstitutional. Further, the public's interest concerning the misdemeanor crime of failure to report an accident, and the degree to which that interest is advanced when a motorist is stopped at random, more than an hour after police have responded to the accident, to verify that the motorist and his passenger were not involved in the accident, is outweighed by the significant interference with the stopped motorist's liberty interest.

The entry is:

Judgment vacated; order denying the motion to suppress vacated; remanded for the entry of an order granting the motion to suppress.

SAUFLEY, C.J., with whom ALEXANDER, J., joins, dissenting.

[¶ 19] Although I agree with the Court's articulation of the law governing the stop at issue, I would conclude that the suppression court's application of that law was correct and should be affirmed. I must, therefore, respectfully dissent.

[¶ 20] A warrantless stop on a roadway "for information-seeking purposes may be reasonable if 'the gravity of the public concerns served by the seizure [and] the degree to which the seizure advances the public interest' outweigh 'the severity of the interference with individual liberty.'" *State v. LaPlante*, 2011 ME 85, ¶ 8, 26 A.3d 337 (quoting *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)). This test governs both roadblock-type stops and individual stops of motorists executed to obtain information about an ongoing investigation. *See id.* ¶¶ 2–4, 9. Safety reasons may also justify a warrantless stop and inquiry in the absence of reasonable articulable suspicion of criminal activity. *Id.* ¶ 8 n. 2 (citing *State v. Pinkham*, 565 A.2d 318, 319–20 (Me. 1989)).

[¶ 21] Thus, the suppression court was required to reach its findings and address each of the three relevant factors, mindful of investigatory and safety concerns, and then balance those factors to assess the reasonableness of the seizure. As the Court agrees, the factual findings of the court are supported by the record and are not clearly erroneous. *See State v. LaForge*, 2012 ME 65, ¶ 9, 43 A.3d 961. Proceeding to a de novo review of whether, using the three-factor test of *Brown*, the

stop was objectively reasonable as a matter of law, *see LaPlante*, 2011 ME 85, ¶¶ 6, 8–9, 26 A.3d 337, I would affirm the motion court's denial of the motion to suppress based on that court's thoughtful balancing of the three factors.

## I. GRAVITY OF THE PUBLIC CONCERNS SERVED BY THE SEIZURE

[¶ 22] An investigation of a serious crime is "sufficiently important to outweigh certain interferences with the liberty interests of stopped motorists." *Id.* ¶ 11. By contrast, an investigation of a civil offense generally does not rise to such a level of importance that an impingement on the liberty of a motorist without reasonable articulable suspicion would be justified. *Id.* ¶ 12.

[¶ 23] The officer here was investigating a crime related to failing to report, or leaving the scene of, an accident. A failure to report an accident involving apparent property damage of $1,000 or more constitutes a Class E crime, as does the failure to report an accident when the accident has resulted in personal injury. *See* 29–A M.R.S. § 2251(1), (8) (2011). Leaving the scene of an accident can also constitute a Class D crime if any personal injuries have resulted or a Class C crime if the person intentionally, knowingly, or recklessly left the scene of the accident and serious bodily injury or death resulted from the accident. *See* 29–A M.R.S. § 2252 (2011).

[¶ 24] When the officer came upon Whitney's vehicle stopped along the side of the road, the officer was investigating a rollover accident that could have resulted in serious injuries, including potential head injuries, to any occupants of the overturned vehicle. Thus, at the time that he encountered Whitney, the officer was both (1) investigating a potentially serious crime

to determine what effect the accident had on any individuals who were in the vehicle when it hit a pole and rolled onto its roof, and (2) looking for any person who may have been injured, perhaps a person disoriented as a result of a head injury.

[¶ 25] In addition to the officer's goal of furthering the criminal investigation, it was objectively reasonable for him to be concerned about the safety of any occupants of the vehicle that he discovered upside-down on the side of the road. *See LaPlante*, 2011 ME 85, ¶ 8 n. 2, 26 A.3d 337 (citing *Pinkham*, 565 A.2d at 319–20). " '[S]afety reasons alone can be sufficient' to allow the detention of a driver if they are based on 'specific and articulable facts.' " *State v. Gulick*, 2000 ME 170, ¶ 14, 759 A.2d 1085 (quoting *Pinkham*, 565 A.2d at 319).

[¶ 26] With an understanding of the public interests served by the stop at issue, it is necessary to examine the second factor for consideration: the extent to which the brief stop advanced those public interests.

## II. DEGREE TO WHICH THE STOP ADVANCES THE PUBLIC INTEREST

[¶ 27] "Courts have recognized that motorist stops may significantly advance the investigation of serious crimes in cases where motorists are stopped soon after the crime and in the vicinity where the crime occurred." *LaPlante*, 2011 ME 85, ¶ 14, 26 A.3d 337. The investigative value of such a stop is significant "because the stopped motorists 'might well have been in the vicinity of the crime at the time it occurred.' " *Id.* (quoting *Illinois v. Lidster*, 540 U.S. 419, 427, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004)). Here, the officer was still in the process of seeking the driver and possible occupants within ninety min-

utes of discovering the scene of the accident, and he still did not know whether any injuries had been sustained. The potential that an injured person was wandering on foot was substantial.

[¶ 28] When the officer approached three pedestrians speaking to someone in Whitney's already-stopped vehicle, he would have been remiss not to check on the pedestrians or the vehicle's occupants. These were among the few individuals whom the officer had encountered during those early morning hours. Objectively viewed, asking the pedestrians and anyone who might be in Whitney's vehicle if they had any information about the accident or about anyone who might be injured could significantly advance the investigation and help the officer determine if anybody needed medical attention. The remaining question, therefore, is whether the extent of the intrusion on Whitney's liberty was so severe as to undermine the reasonableness of the stop undertaken to investigate a potentially serious crime and address any possible injuries.

### III. SEVERITY OF THE INTERFERENCE WITH INDIVIDUAL LIBERTY

[¶ 29] Every traffic stop interferes with a person's liberty interest to some "not insubstantial" degree because the motorist "loses the freedom to travel without interruption." *Id.* ¶ 16. Nonetheless, the significance of the intrusion is diminished if, for instance, "the stop is brief, unlikely to cause anxiety, and planned ahead so as to minimize officer discretion in the field," as in a planned, visible roadblock where officers would ask questions that it would take only a matter of seconds to answer. *Id.* ¶¶ 17–18.

[¶ 30] Roving patrols are generally regarded as more intrusive than roadblocks because they "often operate at night on seldom-traveled roads, and their approach may frighten motorists." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (quotation marks omitted). Here, however, the officer did not have to use the cruiser's flashing lights to effect a stop. Rather, the officer pulled in behind the already-stopped vehicle, asked Whitney not to drive away, spoke to the individuals who were on foot, and then returned to the vehicle to speak with Whitney. Nothing in these facts suggests that the officer's conduct was frightening, and the intrusion involved only a request for Whitney to keep the car stopped where it already was so that the officer could speak to the pedestrians first. The driver of the car, Whitney, waited less than five minutes for the officer to turn to him. This intrusion is distinct from a stop of a traveling vehicle through use of lights or sirens on one or more police cruisers. The officer who stopped Whitney did not have to pull the vehicle over through any sudden, surprising, or frightening means, and the intrusion on Whitney's liberty was very brief and minimal.

### IV. BALANCING OF FACTORS

[¶ 31] Given the minimal scope of the intrusion on Whitney's liberty as compared to the brief stop's potential to yield information crucial to the safety of anyone who might have been involved in the rollover accident that the officer was investigating, and to the criminal investigation itself, I would hold that the officer's direction to Whitney to remain stopped at the roadside until he could first speak with the simultaneously encountered pedestrians was reasonable and did not violate the Fourth Amendment. I would affirm the decision of the motion court.